Revised August 14, 2000

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 99-20274
_____


DUNBAR MEDICAL SYSTEMS INC

                    Plaintiff - Counter Defendant - Appellee

        v.

GAMMEX INC, formerly known as Radiation Measurements Inc

                    Defendant - Counter Claimant - Appellant

_____

Appeal from the United States District Court
for the Southern District of Texas
_____

June 21, 2000

Before KING, Chief Judge, and REAVLEY and STEWART, Circuit
Judges.

KING, Chief Judge:

        Gammex Inc. appeals the district court's entry of judgment
on Dunbar Medical Systems Inc.'s fraudulent inducement claim,
arguing that two clauses in the parties' settlement agreement or
Texas Rule of Civil Procedure 11 bar that claim.  Gammex further
contends that the court erred in finding that there was no intent
to perform at the time the alleged misrepresentations were made,

in awarding punitive damages given the existence of contract language barring the recovery of such damages, in awarding punitive damages given the elements of fraud had not been proved by clear and convincing evidence, and in awarding pre-judgment interest on both compensatory and punitive damages. We affirm the entry of judgment and the award of punitive damages, and reform the judgment solely to clarify the pre-judgment interest award.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Gammex Inc. is a manufacturer of teleradiology equipment, which is used to digitize data from a medium such as x-ray film or ultrasound and to transmit those data to a remote unit for purposes of medical review and diagnosis. Until 1994, Ms. Linda Dunbar, president and sole shareholder of Dunbar Medical Systems, Inc. ("DMSI"), was an independent distributor of teleradiology equipment for Gammex.[1] A by-product of the dissolution of the parties' relationship was a lawsuit, filed by Gammex on April 28, 1994, in which Gammex sought return of equipment and damages ("1994 Litigation"). In February 1995, DMSI filed a counterclaim asserting breach of contract, fraud, defamation, and various

---

[1]  In early 1989, DMSI and DataSpan, Inc. entered into an agreement whereby DMSI became an independent sales representative for DataSpan. Radiation Measurements, Inc. is Gammex's predecessor in interest. DataSpan was acquired by Gammex/Radiation Measurements in 1989. We refer to each of these companies as "Gammex."

other claims against Gammex.  Shortly before trial, the parties executed a Settlement Agreement.  That Agreement is the focus of the case before us.

Discussions leading up to the execution of the Settlement Agreement occurred between December 1995 and July 1996.  In December, the parties participated in unsuccessful court-ordered mediation.  Sometime thereafter, Ms. Margaret Lescrenier, a vice-president of Gammex, telephoned Ms. Dunbar to discuss settlement terms, including the possibility of transferring equipment to DMSI in lieu of cash.  The district court found that in that conversation, Ms. Dunbar told Ms. Lescrenier that she did not want to consider older Courier II units because they had software and hardware defects.[2]  According to Ms. Dunbar, Ms. Lescrenier assured her that the units would be new and come from the latest run of fifty manufactured by Gammex and would be problem free.  A follow-up letter dated February 1, 1996 faxed by Ms. Lescrenier to Ms. Dunbar listed various equipment, including ten Courier II units, that Gammex was willing to give DMSI.  The letter gave a list price of the Courier II units of $10,000 each, a total list price of all offered equipment of $203,600, and stated that "[t]he majority of the above equipment is new, never been used.  Some of the Courier computers were demonstration units."

On February 8, Ms. Dunbar sent a fax to Ms. Lescrenier that

---

[2]  The Courier II is a stand-alone computer that runs teleradiology equipment.

3

responded to the proposal.  That transmission included a list of the same equipment along with dealer transfer prices.  Ms. Dunbar's fax indicated that, based on the dealer prices, the actual value of Gammex's proposal was $44,654.25.  Ms. Dunbar also stated that she did not "know what to do" with some of the listed equipment, and that there had to be a cash settlement along with the equipment package.

The two principals again corresponded later in February. Ms. Lescrenier proposed as a counteroffer a new combination of equipment and $50,000 in cash.  Ms. Dunbar, the district court found, emphasized in a phone conversation with Ms. Lescrenier the importance to DMSI that the equipment (including the Courier IIs) be new.  Ms. Lescrenier made the same representations as earlier — that the Courier IIs were from the latest production run, and that for the most part, the equipment was new or demonstration units and thus practically new.  Ms. Dunbar requested a particular type of camera that normally went with the base units that were part of the proposed package, but was told that Gammex had none in stock and did not wish to purchase one merely for purposes of settlement.[3]

These discussions were outlined in a fax dated February 26. That communication (1) explained the equipment substituted for

_____

[3] Ms. Dunbar later determined that in fact, the camera's manufacturer had earlier ceased production of the requested camera.

4

the items for which Ms. Dunbar indicated she had no use; (2) made reference to an exclusive dealer contract, a definition of a sales territory, service arrangements, and assistance with advertising that were agreed to in earlier mediation proceedings, and (3) offered $50,000 in cash. The total list price associated with the new equipment package was $203,975, and again, the communication indicated that the majority of the equipment was "new, never been used" and that "[s]ome of the Courier computers were demonstration units." The fax also stated that Ms. Dunbar had "misstated the value of the equipment in the original list" in her February 8 response.

Negotiations resumed in late April, when Ms. Dunbar's attorney contacted Gammex's counsel. By April, DMSI was no longer interested in maintaining certain relationships with Gammex,[4] and it indicated that several aspects of the earlier proposals were no longer of value (e.g., a new distributorship agreement, assistance with advertising). Negotiations between the parties' counsel dealt, <u>inter alia</u>, with the amount of cash Gammex was to pay to DMSI, the equipment to be transferred (e.g., whether mouses and cables were included, whether a six-month warranty would be included, configuration and programming

---

[4] The letter Ms. Dunbar's attorney sent to Gammex's attorney listed as part of Ms. Dunbar's settlement proposal that "[a]ll continuing or past relationships will be severed (except for the terms of the settlement agreement, the non-disclosure and software license agreements)."

issues), the availability of documentation regarding the equipment, the availability of discounts on such items as replacement parts, responsibility for shipping and insurance costs, and the timing of the delivery of the cash and the equipment. Thus, the focus of the second stage was on the consideration Gammex was to give DMSI in return for DMSI releasing its claims.

The parties eventually agreed to Gammex's releasing claims related to the 1994 Litigation, and transferring to DMSI the equipment listed in Ms. Lescrenier's second proposal and $70,000 in cash. The final agreement included three express warranties: (1) that Gammex "has good and clear title to the Equipment, and that the Equipment is free of all liens, mortgages and encumbrances at the time of shipment to Dunbar Medical"; (2) that the equipment "is either new and has never been used, or has previously been used as demonstration or loaner equipment"; and (3) that the "Equipment, at the time of shipment to Dunbar Medical, is working and operational in accordance with the manufacturer's specifications applicable to each item included in the Equipment." In return, DMSI agreed to release claims related to the 1994 Litigation. The agreement was signed by Ms. Dunbar, on behalf of herself and DMSI, on July 18, 1996; Charles Lescrenier, Gammex's CEO, signed the agreement on July 23, 1996.

As per the agreement, Gammex transferred $70,000 to DMSI. The parties dismissed, with prejudice, their respective claims.

Ms. Dunbar sent to Gammex instructions regarding how the Courier II units were to be configured and programmed. DMSI received equipment from Gammex, albeit after the date stated in the Agreement. After receiving the equipment, some of which was damaged in transit, Ms. Dunbar determined through testing that it differed in significant ways from what it had been represented to be.

As a result, on November 11, 1996, DMSI filed in the 152nd Judicial District Court of Harris County, Texas an action asserting breach of contract and fraud claims. Gammex removed the case on December 23, 1996 to the United States District Court for the Southern District of Texas.[5] In response to the district court's granting of Gammex's November 28, 1997 motion for a more definite statement, DMSI filed a first amended complaint on January 16, 1998. In that complaint, DMSI alleged breach of contract and fraudulent inducement, and sought $150,000 in compensatory damages, $600,000 in punitive damages, pre- and post-judgment interest, and attorney fees.

Gammex filed a motion for summary judgment on February 2, 1998, arguing, inter alia, that under the Texas Supreme Court's decision in Schlumberger Technology Corporation v. Swanson, 959 S.W.2d 171 (Tex. 1997), the Settlement Agreement barred DMSI's

---

[5] Jurisdiction is claimed under 28 U.S.C. § 1332. DMSI is a Texas corporation with its principal place of business in Harris County, Texas, and Gammex is a Wisconsin corporation with its principal place of business in Middleton, Wisconsin.

fraudulent inducement claim.[6]  The district court denied Gammex's

motion on March 4, 1998, and also denied Gammex's subsequent

motion to reconsider.[7]  A three-day bench trial began March 31,

1998.  Gammex's motion for a judgment as a matter of law was

denied.

In the district court's careful and thorough Findings of

Fact and Conclusions of Law, the court admitted DMSI's parol

evidence of Gammex's prior oral representations and promises,

finding that they did not contradict or vary the Agreement, and

instead specified and clarified the nature of the equipment made

part of that Agreement.  It found that Gammex had breached its

contract with DMSI.  According to the court:

> The evidence revealed that some of the highly technical
> equipment was not only not new, but outmoded, or
> defective, or had been used not merely for
> demonstration or loaner purposes.  The ten Courier II
> units were not programmed as set forth by Linda Dunbar
> in breach of Paragraph 2.2 of the Agreement.  The
> evidence, both testimonial and spreadsheet
> documentation, showed that upon arrival, none of the
> ten Courier IIs captured images off the digitizer or
> ultrasound and that the equipment did not meet
> specifications provided to Gammex by DMSI . . . .
> [C]redible testimony established that a large portion
> of the equipment was not new, but used, and some
> nonoperational or only partly operational.  Despite

---

[6]  The Settlement Agreement contains a choice-of-law clause
that provides that the Agreement "shall be construed and governed
by the laws of the State of Texas."

[7]  Because Gammex's motion to reconsider raised a new
argument — that Texas Rule of Civil Procedure 11 barred DMSI's
claims — the lower court interpreted the motion as a supplemental
motion for summary judgment that was ripe for decision given DMSI
had responded.

> Linda Dunbar's insistence that she wanted Courier II
> units from the last production run that did not have
> the hard drive and software problems identified in the
> state court suit, none of the equipment sent to DMSI
> was manufactured later than 1993, and most was
> manufactured between 1990-1992.  It included old,
> discontinued models . . . .  Some of the equipment had
> been used and taken back by Gammex as trade-ins or
> exchanges.

The court also noted Ms. Dunbar's testimony that the August 1996 value of the transferred equipment was no more than $20,000.  It held that as a result of Gammex's breach, DMSI was entitled to $150,000 in benefit-of-the-bargain damages and to $35,200 in attorney fees.

The court went on to find that Gammex had fraudulently induced DMSI to enter into the Settlement Agreement.  Ms. Lescrenier was found by the court to have knowingly made false statements regarding the transferred equipment's value, condition, and age.  The court found that the estimates of the equipment's value were "deliberately and greatly inflated."  Ms. Lescrenier's statements, which were found by the district court not to be expressions of opinion, were made with the intention of causing Ms. Dunbar to rely on them and settle the parties' dispute.  Ms. Dunbar was found to have relied on Ms. Lescrenier's statements and to have been injured as a result.  The court determined that Gammex's fraud entitled DMSI to $150,000 in benefit-of-the-bargain damages, and $300,000 in punitive damages.

As a result of these determinations, the court ordered on November 23, 1998 that DMSI submit a proposed final judgment, and

9

allowed Gammex to file objections to that proposed judgment.  On February 22, 1999, the court entered final judgment, which, not surprisingly, reflected DMSI's election to recover under its fraud in the inducement cause of action.  The court awarded DMSI $150,000 in compensatory damages, $300,000 in punitive damages, and pre- and post-judgment interest.  Gammex timely appealed.

## II.  THE FRAUDULENT INDUCEMENT CLAIM

Before us, Gammex challenges only the district court's entry of judgment on DMSI's fraudulent inducement claim, its award of $300,000 in punitive damages, and its award of pre-judgment interest on those punitive damages.[8]  In general, Gammex contends that (1) DMSI's claim is barred, either by the Settlement Agreement's terms or by Texas Rule of Civil Procedure 11; (2) the evidence does not support the court's finding of no intent to perform; (3) the Agreement bars the punitive damage award; (4) DMSI has not met its statutory burden in proving entitlement to such damages; and (5) the lower court improperly awarded pre-judgment interest on punitive damages.  We note that Gammex does not challenge the lower court's findings that Ms. Lescrenier made the statements that are at the heart of DMSI's fraudulent

---

[8]  Gammex concedes that DMSI is entitled to recover $150,000 in compensatory damages on its breach of contract claim, and to receive $35,200 in attorney fees.  It also concedes that DMSI is entitled to recover pre-judgment interest at the rate of 6% per annum on the compensatory damages award.

10

inducement claim, that the statements included misrepresentations of fact, or that Ms. Dunbar relied on Ms. Lescrenier's statements.  In assessing Gammex's arguments, we apply the well-established standard of review applicable to bench trials, examining questions of law de novo, and reviewing findings of fact for clear error.  See Gebreyesus v. F.C. Schaffer & Assocs., Inc., 204 F.3d 639, 642 (5th Cir. 2000).

A.  *Whether Contractual Provisions Act as a Bar*

Gammex contends that under Schlumberger Technology Corporation v. Swanson, 959 S.W.2d 171 (Tex. 1997), two provisions within the Settlement Agreement operate to bar DMSI's fraudulent inducement claim.  The first is an "as is" clause, which provides that "[e]xcept as expressly provided for herein, the equipment is conveyed and transferred by Gammex to Dunbar Medical as is, where is, and with all faults, and there are no warranties which extend beyond the description of the equipment on the face of exhibit 'A' attached hereto."[9]  ¶ 2.2.  The second provision, a merger clause, provides that the Settlement Agreement "contains the entire agreement between the parties, and no representations, inducements, promises, or agreement, oral or otherwise between the parties with reference thereto and not

_____

[9]  The quoted language appears in all capital letters, in a bold-face type, at the end of the paragraph that lists Gammex's warranties with regard to the equipment.

11

embodied herein shall be of any force." ¶ 4.2.

The district court rejected Gammex's argument in its review of Gammex's motion for summary judgment. It distinguished Schlumberger from the case sub judice by noting that "while the agreement here may appear to Gammex to be an integrated one, there was no express, specific disclaim of reliance on Gammex's alleged statements and representations." We also reject Gammex's argument, but do so for somewhat different reasons.

In Schlumberger, the Texas Supreme Court recognized the inherent tension between the principle that the "[p]arties should be able to bargain for and execute a release barring all further dispute," 959 S.W.2d at 179, and prior authority holding that clauses in contracts, including merger and disclaimer provisions, need not bar subsequent claims of fraudulent inducement. See id. at 178-79. The court held that "a release that clearly expresses the parties' intent to waive fraudulent inducement claims, or one that disclaims reliance on representations about specific matters in dispute, can preclude a claim of fraudulent inducement," but also emphasized that "a disclaimer of reliance or merger clause will not always bar" such a claim.[10] Id. at 181. Because the

_____

[10] The court cited its opinion in Prudential Insurance Co. v. Jefferson Associates, Ltd., 896 S.W.2d 156, 162 (Tex. 1995), as describing some of the circumstances under which such clauses would not be binding. Included in those circumstances are where the contract was procured by fraud and where a seller's conduct obstructs a buyer's ability to inspect the condition of what is being sold. See id. The court also noted that "[w]here the 'as is' clause is an important part of the basis of the bargain, not

12

parties should be able to rely on their negotiated disclaimer or merger clauses to resolve fully their disputes, the question for the court was "under which circumstances such disclaimers are binding." Id. at 179. For the answer to this question, the court looked to "[t]he contract and the circumstances surrounding its formation . . . ." Id.; see also Prudential Ins. Co. v. Jefferson Assocs., Ltd., 896 S.W.2d 156, 162 (Tex. 1995) (stating that, in determining whether an "as is" clause is unenforceable, "[t]he nature of the transaction and the totality of the circumstances surrounding the agreement must be considered").

We read Schlumberger as holding that particular contract clauses may, under certain limited circumstances, curtail the contracting parties' ability to challenge the contract's validity on fraudulent inducement grounds. Schlumberger gives us some indication of what those circumstances may include. That the negotiating parties in Schlumberger were represented by counsel, were experts in the subject matter of the negotiations, and were bargaining at arm's length were important to the court.[11] See Schlumberger, 959 S.W.2d at 180. In addition, the court noted

_____

an incidental or 'boiler-plate' provision, and is entered into by parties of relatively equal bargaining position, a buyer's affirmation and agreement that he is not relying on representations of the seller should be given effect." Id.

[11] The argument that merger or disclaimer clauses should be binding whenever parties to the agreement were represented by independent legal counsel was expressly rejected by the Schlumberger court. See 959 S.W.2d at 178.

13

that at the center of the parties' dispute was the object of the alleged misrepresentations — the value of the mining project — and that the sole purpose of the unambiguous release was to end that dispute "once and for all." Id.

We must assess whether Gammex and DMSI's Settlement Agreement "clearly expresses the parties' intent to waive fraudulent inducement claims, or . . . disclaims reliance on representations about specific matters in dispute." Id. at 181. The parties in the instant action were represented by counsel, and bargained at arm's length over the terms of the Settlement Agreement. The final bargain struck exchanged releases of claims for equipment and cash. Both parties could be considered extremely knowledgeable about the type of equipment reflected in the agreement — one manufactured and marketed that equipment, the other was previously a distributor of the equipment.

We nonetheless conclude that under the circumstances of this case, the "as is" and merger clauses do not bar DMSI's fraudulent inducement claim. The Agreement reflects that Gammex and DMSI specifically contemplated future, although not continuing, interactions with one another. DMSI had the right to send one employee to Gammex's offices for training on the Courier II and other equipment, Gammex was to provide DMSI free support by telephone for one year, and Gammex agreed to apply for one year its standard trade discount to DMSI's purchases of replacement parts and supplies. In addition to future interactions, the

14

parties contemplated future disputes related to the Settlement Agreement.  A punitive-damages provision in that Agreement presupposes a claim arising from or related to it.  This suggests that the parties were not seeking to end all disputes between them "once and for all."  Schlumberger, 959 S.W.2d at 180.  Although these observations are not dispositive, they frame our analysis of the "as is" and merger clauses.

As the Texas Supreme Court noted in Prudential Insurance, although an "as is" clause can negate a claim that a seller's conduct caused a buyer injury, see 896 S.W.2d at 161, such a clause is not always enforceable.  See id. at 162.  The court explicitly noted that fraud used to induce agreement was a circumstance that rendered that clause unenforceable.  See id. ("A buyer is not bound by an agreement to purchase something 'as is' that he is induced to make because of a fraudulent representation or concealment of information by the seller.").  The issue at hand is whether the "as is" clause demonstrates the parties' clear intent to waive fraudulent inducement claims or disclaim reliance on representations about specific matters in dispute.  See Schlumberger, 959 S.W.2d at 181.

We conclude that it does not.  The misrepresentations in this case went to the condition of the equipment (i.e., its "newness" and its being problem-free).  The contract specifically warrants that the equipment be either "new and . . . never . . . used, or . . . previously . . . used as demonstration or loaner

15

equipment" and that it would be "working and operational in accordance with the manufacturer's specifications . . . ." The "as is" clause specifically excepts the other explicit warranties. Under these circumstances, we cannot conclude that DMSI, in agreeing to the "as is" clause, disclaimed reliance on Gammex's representations regarding the equipment's age or functioning, or intended to waive fraudulent inducement claims. Cf. SMB Partners, Ltd. v. Osloub, 4 S.W.3d 368, 371 (Tex. App. 1999, no pet.) (holding that an "as is" clause that specifically excluded other warranties did not apply to the purported misrepresentation and thus did not bar the fraudulent inducement claim).

The merger clause, on its face, represents a closer question. In agreeing to that clause, DMSI agreed that "no representations . . . oral or otherwise between the parties with reference [to the Settlement Agreement] and not embodied [in the Agreement] shall be of any force." Again, however, we find that the language of the clause is not sufficient to bar DMSI's fraudulent inducement claim. Gammex contends that Ms. Lescrenier's representations regarding the equipment's age and ability to operate problem-free are not embodied in the Settlement Agreement's language, and DMSI argues the opposite. The agreement's reference to new equipment that had never been used is the outgrowth of the February discussions regarding the equipment, appearing in the contract after DMSI reminded Gammex

16

of Ms. Lescrenier's proposal that the majority of the equipment was new, with some demonstration equipment, and drafted proposed language that stated that the equipment is "either new and never been used or only used as demonstration units."[12]  Whether this history is sufficient to conclude that the representations are embodied in the agreement is something we need not decide, for we can say that under the circumstances, the agreement does not reflect the "requisite clear and unequivocal expression of intent necessary to disclaim reliance on the[] specific representations" by Gammex.  Schlumberger, 959 S.W.2d at 179.  As a result, the district court did not err in concluding that DMSI's fraudulent inducement claim was not barred.[13]

---

[12]  DMSI also sought additional language relating to a six-month warranty on the equipment.  This was rejected.  The description of the equipment to be transferred in the final agreement differs from the description in the documents exchanged by Ms. Lescrenier and Ms. Dunbar in including a reference to "loaner" equipment.  This addition does not contradict Ms. Lescrenier's representations, however, as loaner equipment, although not new, could still come from the last fifty manufactured by Gammex and be problem-free.

[13]  We note that the parties negotiated separate release clauses covering any and all claims "made in or based on or related to the claims made in the Litigation."  The "Litigation" was defined as the action Gammex initiated in 1994.  Thus, we do not read the release clauses as covering claims arising from the Settlement Agreement.  Indeed, in a section of the contract separate from the "Releases" section, the parties included provisions relating specifically to the Settlement Agreement.  Those provisions were the merger clause, the clause prohibiting recovery of punitive and special damages, and the choice-of-law clause.

17

B.  *Whether Rule 11 Acts to Make Oral Representations*
*Unenforceable*

Gammex also argues that under the Texas Supreme Court's opinion in Padilla v. LaFrance, 907 S.W.2d 454 (Tex. 1995), Texas Rule of Civil Procedure 11 makes oral representations made in the course of negotiating a settlement agreement unenforceable.[14]  As a result, DMSI cannot rely on Ms. Lescrenier's statements to support a claim of fraudulent inducement.  Gammex takes issue with the district court's rejection of this argument, contending that the court erred in concluding that because the Settlement Agreement was to be performed in less than one year, the statute of frauds does not apply.

Like the district court, we conclude that Gammex's argument must be rejected, although we base our decision on different reasoning.  In Padilla, the Texas Supreme Court faced the question of whether a series of letters between parties constituted an agreement that satisfied Rule 11's writing requirement.  Analogizing to the statute of frauds, the court held that the letters evidenced a binding agreement, in part because they reflected "all material terms of the agreement." 907 S.W.2d at 460-61.  Gammex wishes to use language within the

---

[14]  Under Rule 11, "no agreement between attorneys or parties touching any suit pending will be enforced unless it be in writing, signed and filed with the papers as part of the record, or unless it be made in open court and entered of record."  Tex. R. Civ. P. 11 (West 2000).

<u>Padilla</u> opinion to require that all oral representations made in the context of settlement negotiations be in writing in order to be enforceable. <u>See</u> <u>id.</u> at 460 ("To satisfy the statute of frauds, 'there must be a written memorandum which is complete within itself in every material detail . . . .'" (quoting <u>Cohen v. McCutchin</u>, 565 S.W.2d 230, 232 (Tex. 1978))). Gammex contends that because oral settlement agreements are unenforceable as a matter of law, no claim of fraudulent inducement can be brought. It looks to <u>Weakly v. East</u>, 900 S.W.2d 755, 758 (Tex. App. 1995, writ denied), for support for this contention.

We find <u>Weakly</u> distinguishable on its facts. In that case, plaintiffs alleged that defendants, in an effort to forestall the sale of the real estate to another buyer and to purchase that property at a lower price in a foreclosure sale, promised to purchase real estate with no intention of actually carrying out that promise. <u>See</u> <u>id.</u> at 758. The court found that the essence of the fraud claim was the oral promise to purchase realty. <u>See</u> <u>id.</u> Because a contract for the sale of realty is not enforceable unless in writing, and because the alleged fraud did not prevent the necessary writing, the court found that summary judgment in favor of the defendants was proper on the fraud claim. <u>See</u> <u>id.</u>

Gammex's argument could have more force if DMSI was seeking to enforce as a contract an alleged oral settlement agreement between Ms. Dunbar and Ms. Lescrenier. Here, however, DMSI challenges the validity of the signed Agreement. Unlike the

19

plaintiffs in Weakly, DMSI alleges that Gammex's actions constituted fraud in the inducement — the writing, signed by the parties, was procured by Ms. Lescrenier's misrepresentations as to the condition of the equipment to be transferred. This allegation cannot be said to be an attempt to by-pass the statute of frauds via a fraud claim, or an attempt to enforce an otherwise unenforceable oral settlement agreement. DMSI's injury stems from Gammex's alleged violation of its independent legal duty not to procure a contract with DMSI through fraud. See Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, 960 S.W.2d 41, 46 (Tex. 1998).

Gammex seeks to distinguish Formosa on the ground that it involves a contract, rather than a settlement agreement. Rule 11 applies only to settlement agreements. Although it is clear that a settlement agreement must be in writing to be enforceable under Texas courts' interpretation of Rule 11, we must reject Gammex's attempt to rely on the scope of that Rule to negate DMSI's fraudulent inducement claim. We can think of no principled reason for distinguishing between fraudulent inducement claims targeting contracts and those targeting settlement agreements, and Texas law provides us with no cause to do so.

In general, Texas law treats a settlement agreement as a contract, and courts typically analyze an agreement's enforceability following contract law. See Certain Underwriters at Lloyd's v. Oryx Energy Co., 203 F.3d 898, 901 (5th Cir. 2000);

20

Williams v. Glash, 789 S.W.2d 261, 264 (Tex. 1990); National Cas. Co. v. Lane Express, Inc., 998 S.W.2d 256, 262 (Tex. App. 1999, writ denied); Stewart v. Mathes, 528 S.W.2d 116, 118 (Tex. Civ. App. 1975, no writ). Like a contract, "an agreement in compliance with [Rule 11] is subject to attack on the grounds of fraud or mistake." Kennedy v. Hyde, 682 S.W.2d 525, 529 (Tex. 1984) (citing Burnaman v. Heaton, 240 S.W.2d 288 (Tex. 1951)). There is no suggestion in the instant case that the signed Settlement Agreement does not comply with Rule 11's requirements. "[A] fraud claim can be based on a promise made with no intention of performing, irrespective of whether the promise is later subsumed within a contract." Formosa, 960 S.W.2d at 46; see also Spoljaric v. Percival Tours, Inc., 708 S.W.2d 432 (Tex. 1986) (holding, in a fraudulent misrepresentation case, that evidence was sufficient to support jury finding that employer did not intend to implement a bonus plan when he orally promised to do so). Under Texas law, parties challenging contracts as fraudulently induced may rely on evidence of oral promises or agreements to support their claims. See Santos v. Mid-Continent Refrigerator Co., 471 S.W.2d 568, 569 (Tex. 1971) (per curiam) ("The parol evidence rule will not prevent proof of fraud or mutual mistake."); Dallas Farm Mach. Co. v. Reaves, 158 Tex. 1, 307 S.W.2d 233, 239 (1957) (holding that a merger clause does not bar the use of parol evidence to establish that the contract was induced by fraud). Padilla negates none of these principles. We

21

therefore conclude that neither Padilla nor Rule 11 precludes

DMSI's fraudulent inducement claim.[15]

C. *Whether a Factual Basis Exists for a Finding of Fraud*

Under Texas law, a party claiming fraudulent inducement must demonstrate (1) a material representation, (2) that was false, (3) that was either known to be false when made or was asserted without knowledge of the truth, (4) that was intended to be acted upon, (5) was relied upon, and (6) that caused injury. See Formosa, 960 S.W.2d at 47; DeSantis v. Wackenhut Corp., 793 S.W.2d 670, 688 (Tex. 1990), cert. denied, 498 U.S. 1048 (1991). "A promise of future performance constitutes an actionable misrepresentation if the promise was made with no intention of performing at the time it was made." Formosa, 960 S.W.2d at 48.

Gammex contends that the district court erred in finding that Ms. Lescrenier intended not to perform at the time she

---

[15] Gammex also contends that we should apply language from Boggan v. Data Systems Network Corp., 969 F.2d 149 (5th Cir. 1992), to hold that Ms. Lescrenier's statements cannot constitute actionable misrepresentations. See id. at 153 ("It is well settled that the negotiations and discussions leading up to the writing cannot displace the terms of the written agreement."). We decline to do so. Our decision in Boggan was in part based on the finding that the alleged misrepresentations were expressions of intent, rather than statements of fact, see id., and that statements such as "I think we have a deal" could not, under the circumstances, be considered actionable misrepresentations. In the case before us, the district court found that Ms. Lescrenier's statements were misrepresentations of fact, or promises made with no intention of performing. Each of these is an actionable misrepresentation under Texas law. See Formosa, 960 S.W.2d at 46-48.

22

represented that the transferred Courier IIs would come from the last production run and would be problem free. To support this contention, it points to the fact that the Ms. Lescrenier's proposals were not fully accepted in February, to evidence that Ms. Lescrenier relied on a list of available equipment prepared by Mr. Sopotnick, and to evidence that Ms. Lescrenier did not participate in the second stage of negotiations. Gammex urges us to conclude that the evidence supporting the lower court's finding of the requisite intent is "so weak that it creates only a mere surmise or suspicion of its existence," T.O. Stanley Boot Co. v. Bank of El Paso, 847 S.W.2d 218, 222 (Tex. 1992), and is thus insufficient.

Our review of the district court's finding is limited. Under the Federal Rules, "due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." FED. R. CIV. P. 52(a); see also Coury v. Prot, 85 F.3d 244, 254 (5th Cir. 1996). "The burden of showing that the findings of the district court are clearly erroneous is heavier if the credibility of witnesses is a factor in the trial court's decision." Id. at 254 (citing Village Fair Shopping Ctr. v. Stanley Broadhead Trust, 588 F.2d 431, 434 n.2 (5th Cir. 1979)). In this case, the trial judge specifically noted her assessments of Ms. Dunbar's, Ms. Lescrenier's, and Mr. Sopotnick's credibility.

We do not emerge from our review of the record with a

23

"'definite and firm conviction that a mistake has been committed.'" <u>Concrete Pipe & Prods. of Cal., Inc. v. Construction Laborers Pension Trust for Southern Cal.</u>, 508 U.S. 602, 622 (1993) (quoting <u>United States v. United States Gypsum Co.</u>, 333 U.S. 364, 395 (1948)).  Evidence indicates that although Ms. Lescrenier was not an active participant in the last rounds of negotiations, her second February proposal was a basis upon which those negotiations built.  Although Ms. Lescrenier indicated in her testimony that Gammex's inventory changed between February and August, when the equipment was shipped, Mr. Sopotnick testified that there was no change.  He also testified that Ms. Lescrenier accompanied him when he reviewed the inventory to assess what equipment was available.  Given this and other evidence in the record, we conclude that the district court's finding is not clearly erroneous.

### III.  PUNITIVE DAMAGES AND PRE-JUDGMENT INTEREST

Because we conclude that the district court did not err in entering judgment on DMSI's fraudulent inducement claim, we turn to Gammex's challenges to the lower court's punitive damages and pre-judgment interest decisions.  With regard to punitive damages, Gammex contends that the district court erred in not enforcing a contractual provision in which DMSI explicitly released claims for punitive damages, and that DMSI is not entitled to such damages because it has not met its statutory

24

burden of proof.

The parties' Settlement Agreement provides that

As to any and all claims that may be asserted by Dunbar Medical or Dunbar arising from or in any way relating to this Settlement Agreement, including but not limited to the Equipment, in no event shall Dunbar Medical or Dunbar be entitled to recover special, consequential or punitive damages, and recovery of special, consequential or punitive damages shall be absolutely precluded.

Gammex contends that this language must be interpreted as a release of DMSI's punitive damages claim, and that because the clause was freely negotiated, it bars DMSI's recovery of such damages.

In general, a party is not bound by a fraudulently induced contract.  See Formosa, 960 S.W.2d at 46; Prudential Ins., 896 S.W.2d at 162.  Underlying this rule is the notion that a party induced by fraud to enter into an agreement has not provided the assent necessary to make a binding contract.  See Dallas Farm Mach. Co., 307 S.W.2d at 240; Edward Thompson Co. v. Sawyers, 111 Tex. 374, 234 S.W. 873, 874 (1921) ("Contracts, though reduced to writing, are avoided when induced by material promises, never intended to be kept, not because one is allowed to vary his written contract, but because real assent is essential to a binding contract.").  "One who is entitled to avoid an entire written contract because it lacked his assent can no longer be held bound by any of its stipulations . . . ." Sawyers, 234 S.W. at 874-75.

25

Because a party is not bound by a contract he was induced by fraud to enter, we find inapplicable <u>Memorial Medical Center v. Keszler</u>, 943 S.W.2d 433 (Tex. 1997), a case Gammex relies upon to support its contention that the punitive damages provision is enforceable. In <u>Memorial Medical</u>, the Texas Supreme Court determined, <u>inter alia</u>, that a post-injury release of claims for gross negligence is not against public policy. <u>See</u> <u>id.</u> at 435. The settlement agreement and release at issue in the case were considered valid documents. <u>See</u> <u>id.</u> at 434 ("The parties . . . have not contested the validity of the release or claimed ambiguity or fraud in its execution."). Thus, the issue regarded the enforceability of a clause within the contract, not the validity of the contract. Here, we consider whether a clause in a contract otherwise <u>unenforceable</u> against DMSI may nonetheless preclude punitive damages. We hold that it cannot. Because DMSI was found to have been induced into entering the Settlement Agreement by Gammex's fraud, the district court did not err in concluding that the Agreement's punitive damages provision was not binding on DMSI.

Gammex next argues that DMSI has not met its burden under section 41.003 of the Texas Civil Practice and Remedies Code, and therefore is not entitled to a punitive damages award. Section 41.003(a) provides that a claimant prove "by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from (1) fraud, (2) malice,

26

or (3) wilful act or mission or gross neglect in wrongful death actions . . . ." Gammex attacks the lack of "clear and convincing" evidence supporting a finding of no intent to perform on the part of Ms. Lescrenier, and argues that this case exhibits neither the "evil mind," Transportation Ins. Co. v. Moriel, 879 S.W.2d 10, 18 (Tex. 1994), nor the "extraordinary harm," id. at 24, that are required under Texas law to award punitive damages.

Gammex's reliance on Moriel and other cases building on its principles is misplaced. The cases cited each deal with allegations of bad faith. See State Farm Fire & Cas. Co. v. Simmons, 963 S.W.2d 42 (Tex. 1998) (involving allegations that insurance company breached its duty of good faith and fair dealing); Universe Life Ins. Co. v. Giles, 950 S.W.2d 48 (Tex. 1997) (same); Moriel, 879 S.W.2d at 14 (same). As subsequent Texas Supreme Court decisions have recognized, Moriel "clarified the requirements for the imposition of punitive damages in a bad faith case." Simmons, 963 S.W.2d at 47; see also Giles, 950 S.W.2d at 54 (noting Moriel limits recovery of punitive damages in bad faith cases to, among others, those able to show fraudulent conduct in addition to bad faith).

This is a fraud case. Under section 41.003(a), DMSI had the burden of demonstrating that its harm was due to Gammex's fraud. The statute defines fraud to be "fraud other than constructive fraud." TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(6). As the Texas Supreme Court has noted, "[a] finding of intent to harm or

27

conscious indifference to the rights of others will support an award of exemplary damages. In [Trenholm v. Ratcliff, 646 S.W.2d 927, 933 (Tex. 1983)], this court held that a fraudulent inducement was enough to support at least a finding of conscious indifference." Spoljaric, 708 S.W.2d at 436 (internal citations omitted). DMSI did not also need to show malice, as the statute is explicit in providing that a claimant needs to show harm from fraud or malice.

DMSI was required to show by clear and convincing evidence the elements of punitive damages provided in section 41.003(a). See TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(b). Clear and convincing evidence is "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Id. § 41.001(2). Gammex contends only that evidence is insufficient to support a finding that Ms. Lescrenier had no intent to perform when she assured Ms. Dunbar of the condition of the equipment to be transferred. We have considered the evidence under the clear error standard and have rejected Gammex's argument. It fares no better under the standard applicable here. Thus, we conclude that the district court did not err in awarding punitive damages.

The final argument Gammex raises before us challenges the district court's award of pre-judgment interest. The court's judgment provides that DMSI "is also entitled to recover pre-

28

judgment interest at the rate of 10% per annum from November 18, 1996 until entry of judgment . . . ." Gammex contends that this is an award of pre-judgment interest on punitive damages in addition to compensatory damages. Under Texas law, pre-judgment interest is not recoverable on an award of punitive damages. See TEX. CIV. PRAC. & REM. CODE ANN. § 41.007. We hold that DMSI is entitled to pre-judgment interest at the rate of 10% per annum assessed on only the compensatory damages portion of its award.[16]

## IV. CONCLUSION

For the foregoing reasons, we affirm the district court's entry of judgment on DMSI's fraudulent inducement claim, and its award of punitive damages. We reform the judgment to clarify that pre-judgment interest at the rate of 10% per annum is to be assessed only on the compensatory damage award. See Krieser v. Hobbs, 166 F.3d 736, 747 (5th Cir. 1999).

AFFIRMED in part; REFORMED in part. Gammex shall bear the costs of this appeal.

---

[16] Gammex also asks that we reform the interest award to reduce the rate to 6%, as this was the rate DMSI requested. It does not contend that an award at the higher rate was erroneous, and thus we deny its request.

29